**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GARY MCGAHEE, | : | CRIMINAL ACTION |
| | : | |
| Petitioner | : | NO. 03-788 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | CIVIL ACTION |
| | : | |
| Respondent. | : | NO. 07-2398 |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                            July 17, 2008

   Presently before the Court are Gary McGahee's ("Petitioner's") Motion to Vacate

Sentence Pursuant to 28 U.S.C. § 2255, and the Government's Memorandum of Law in

Opposition.  For the reasons stated below, Petitioner's Motion to Vacate is **GRANTED**.

**I.  BACKGROUND**

  **A.  Procedural History**

   On July 8, 2005, Petitioner was convicted of attempted possession of heroin with

intent to distribute and conspiracy to commit robbery.  He was represented at his trial by George

Henry Newman.  Prior to sentencing, Petitioner requested and received appointed counsel by the

Federal Public Defender for the sentencing phase of his trial.  On June 15, 2006, this Court

sentenced Petitioner to sixty-five months imprisonment.

   On June 14, 2007, now proceeding pro se, Petitioner timely filed the present

Motion to Vacate under 28 U.S.C. § 2255.  By order dated November 19, 2007, the Court once

again appointed the Federal Public Defender as counsel. (Docket No. 66.)  A hearing was held on

March 25, 2008.  After the hearing, the parties filed additional Memoranda, in which Petitioner's claims were condensed into three ineffective assistance of counsel claims: (1) failure to investigate a possible alibi defense; (2) failure to use transcripts to impeach a witness; (3) and failure to object to impermissible vouching and misstatements of law made in the Government's closing argument.

### B.  Factual History

#### 1.  The Crime

Petitioner's conviction arose out of his role in a robbery committed on the evening of January 20, 2001.  According to the trial testimony, on that date, Marcellas Hoffman and Gary Oliver drove from Virginia to New Jersey, where they engaged Petitioner, who was Hoffman's cousin, to assist them in a robbery of Hoffman's drug supplier, Juan Rosado.  Hoffman and Oliver picked up Petitioner in Camden, and together they drove to Philadelphia.  Once in Philadelphia, they met a partner of Rosado's, David Vazquez, at a restaurant, and then followed him as he drove to an abandoned house.  After parking, Hoffman and Oliver left the car, with Petitioner stationed as the driver and lookout.  As Hoffman, Oliver, and Vazquez gathered in the house, ready to make the deal, Hoffman and Oliver posed as police officers, handcuffed Vazquez and demanded the drugs.  When Vazquez said that he did not have the drugs, Hoffman threatened him and shot him in the leg.

Before long, Hoffman received a radio communication, allegedly from Petitioner, stating that Rosado was approaching the house.  Upon Rosado's arrival, Hoffman and Oliver posed as police officers again and handcuffed Rosado.  Rosado did not have the drugs either—he had apparently left them in his vehicle, a Lincoln Navigator, that was parked nearby and was

2

occupied by Rosado's wife and mother-in-law.  Hoffman led Rosado outside, leaving Oliver

behind to watch over the handcuffed Vazquez.  Hoffman forced Rosado into the backseat of his

car while he went to retrieve the drugs from Rosado's Lincoln Navigator.  However, before

Hoffman could get there, Rosado jumped out of the backseat and tried to make an escape.

Hoffman caught up with him in an alley, and, in a fury, shot Rosado two times.  After a bit more

scuffling, Rosado was able to escape to his Navigator, and drive away.

      A  few hours later, Oliver was arrested at the scene, still guarding Vazquez in the

house.  Hoffman was arrested shortly thereafter.  Petitioner was not arrested until October—close

to nine months after the robbery—and only after Oliver admitted to his own role in the crime and

identified Petitioner as the third participant.

### 2.  The Trial

      At Petitioner's trial, the Government's case centered around Oliver's testimony.

Because Hoffman did not testify, Oliver was the only person with first-hand knowledge who

identified Petitioner as the third participant in the robbery.  While the victims, Vazquez and

Rosado, could identify Hoffman and Oliver, they could not identify Petitioner because he was

allegedly in a car waiting to drive away while most of the events occurred.[1] (Trial Tr. vol. 1,

190:7-15; 196:12-198:7, July 6, 2005; Trial Tr. vol. 2, 8:1–10, July 7, 2005.)  Oliver testified that

while he had not met Petitioner prior to the date of the crime, and did not know him by any name

other than "cuz," he had plenty of time to observe him on that day, and he was confident in court

as he identified Petitioner. (Trial Tr. vol. 1, 103:1-4; 130:21-131:19.)  In further support of his

---

1.   One of the victims got a partial view of the driver, but he could only describe him by saying that it was an older
man, by which he meant someone in his forties. (Trial Tr. Vol. 1, 196:12-198:7.)

identification, Oliver recalled that Hoffman referred to the third member of their team as his

cousin.  It is undisputed that Petitioner was Hoffman's cousin. (Id. at 103:1-4.)  On cross-

examination, Newman questioned Oliver as to his motivation for testifying, in particular as to the

plea bargain he negotiated in exchange for fingering Petitioner. (Id. at 145:7-149:20;155:21-

156:10; 157:5-159:18.)  Newman also attacked Oliver for only identifying Petitioner many

months after his arrest, (id. at 149:21-150:7.), and for repeatedly changing his story. (Id. at

151:12-153:19.)

Another key witness at the trial was Gloria Hoffman, the wife of Marcellas

Hoffman.  She testified that she met Petitioner during a trip from Virginia to visit with her

husband who was in jail, and in that meeting Petitioner admitted to her that he had been the

driver. (Trial Tr. vol. 2, 33:1–18.)  Newman's cross-examination targeted her concern that she

might get more prison time on other pending charges if she did not cooperate with the

Government, as well as her very extensive criminal history, including convictions for drugs,

larceny, and forgery, among other crimes. (Id. at 36:5-39:12.)

The rest of the evidence at trial centered on proving the details of the crime, and

did not specifically identify Petitioner as the getaway driver.  After the closing arguments, a jury

found Petitioner guilty on two counts and not guilty on two other counts.

### 2.  The Hearing

In the evidentiary hearing to consider this Motion, testimony centered on the

question of trial strategy, specifically whether Counsel should have investigated and put on an

alibi defense.  The hearing testimony confirmed that during the lead-up to the trial, Petitioner,

who was released on bond, spoke to his attorney on numerous occasions. (Mot. Vacate Hr'g Tr.,

73:2-6, Mar. 25, 2007.)  In at least one conversation, they discussed possible defenses.  At the

hearing, Newman testified as follows:

> He gave me the names [of the alibi witnesses]—at some point in time.  I can't tell
> you when, because I—it's on a piece of paper I turned over to . . . the Federal
> Defender. . . .  I did write down the names of several potential alibi witnesses, and
> I—glancing at [my notes] today, I see that Mr. McGahee had told me that he was
> at a club or a bar with those three individuals.  I was not at the time given any
> phone numbers or any way of locating those particular witnesses.

(Id. at 77:12-21.)  Newman's notes confirm that he was given the names of three individuals

—Hugh Frank Vogues, Frank Hutchinson, and Jose Sindo—who could have possibly testified

that Petitioner was out drinking at the time of the crime. (Petr.'s Mem., Ex. 1.)  The notes not

only contain both the first and last names of all three potential witnesses, but the name of the

workplace for two of them. (Id.)  Even so, Newman stated that, as a result of being given only

incomplete information, he did nothing to investigate the alibi—he did not attempt to contact the

witnesses, hire an investigator to search for them, or request more information from Petitioner.

(Id. at 78:8-14.)  Newman also indicated that he was not paid to hire an investigator, and even the

fees he required for basic representation were at times overdue, causing Newman on at least one

occasion to threaten to quit were he not promptly paid. (Id. at 93:10-13.)  But Newman testified

that even if he had the money, "at a minimum, I would have needed more information in order to

locate those witnesses." (Id. at 78:8-14.)  He also stated that if he had received more complete

contact information for Vogues, Hutchinson, and Sindo, he "would have contacted them." (Id. at

78:1-4.)  For Petitioner's part, although he was free to meet Newman and they met many times,

Petitioner did not pro-actively bring the proposed alibi witnesses to Newman's office. (Id. at

78:18-25.)

According to Newman, his decision not to pursue the alibi defense was not made simply because of a lack of contact information—he "confess[ed] that [he] was disposed against putting an alibi defense on." (Id. at 79:9-10.)  One reason was that prior to Petitioner's trial, Marcellas Hoffman was tried for the same underlying crime.  At that trial, Petitioner's mother, Pearl McGahee, provided an alibi for Hoffman.  Newman of course knew of this trial, and in developing his trial strategy, he examined the record.  He concluded that, overall, bringing an alibi defense was, in his opinion, a "bad idea." (Id. at 76:18-24.)  And while he did not remember the details of the Hoffman trial transcript, he remembered thinking that in particular Pearl's testimony was "not helpful." (Id. at 77:4-6.)  Hoffman was convicted and sentenced to life imprisonment.

Newman described the alternative trial strategy, which he did employ, as follows:

> I thought it was a very defendable case. . . . [T]here were several layers to it.  One was I thought the witnesses were pretty bad.  They had a lot of baggage—criminal records.  One was an admitted drug dealer on a fairly large level who . . . was not able to identify my client.  The only person who specifically identified him was a guy named Oliver who I thought was a very impeachable witness. . . .
> Mr. Hoffman's wife . . . was a bit more troublesome, because I had less impeachment material for her than I did for Oliver, but I had a fair amount ....  She wasn't an eye witness.

(Id. at 79:18-80:10; 81:18-22.)  Another layer to the case Newman identified at the hearing was that the discovery file seemed to be incomplete, and what little there was included contradictions among the Government's witnesses.  He thought these failings would provide further grist for creating reasonable doubt. (Id. at 80:11-81-10; 82:13-16.)

In concluding his hearing testimony on his strategic choices, Newman summarized as follows:

Q: [A]s an experienced criminal defense lawyer, then you made a strategic decision that . . . your best course of action was to attack those . . . two tainted witnesses and the lack of evidence as opposed to putting on any . . . alibi witnesses, if you had them.

A: Well, I didn't have [the information for the alibi witnesses].  So I couldn't make that choice at the time, but . . . I was satisfied that attacking the witnesses and attacking . . . the detective [would be effective].

(Id. at 81:23-82:7.)

Petitioner did not testify at trial.  As set out above, Petitioner gave the names of at least three individuals who could have provided Petitioner's alibi.  They were, in the order they eventually testified at the hearing, Hugh Frank Vogues, Frank Hutchinson, and Jose Sindo—all three decades-long friends of Petitioner.

According to the combined testimony of these three witnesses, Petitioner could not have been a participant in the robbery because he was with them on the evening of January 20, 2001.  At around 5:30 or 6:00 p.m., Vogues and Hutchinson traveled from Philadelphia, where they both worked, to Camden for a night of drinking at several different bars. (Id. at 6:12-14.)  They were joined by Petitioner at one bar, sometime around 6:00 p.m. (Id. at 6:17-7:7; 35:20-22.)  They called Jose Sindo and asked that he join them, which he did sometime shortly thereafter. (Id. at 8:10-13.)  Each stated that they remembered the night in question, some six years prior to the hearing, because they were out celebrating a series of birthdays occurring in January, as they did each year. (Id. at 10:21-11:3; 24:8-13; 35:12-19.)

While all three witnesses testified to this same basic set of facts, there were some inconsistencies as well.  Vogues stated that they met up at 5:30 or 6:00 p.m., (id. at 6:7-8), while Hutchinson indicated it was 6:30 or 7:00 p.m. (See id. at 23:22-25.)  Both Vogues and

Hutchinson contradicted their affidavits, which stated that the evening began closer to 4:00 p.m. (See id. at 28:19-24; Gov't's Opp'n Mem 7-8.)  In Vogues's testimony, he could not seem to keep straight whether he met with Petitioner on January 20 or 21, eventually testifying that it was both nights. (Mot. Vacate Hr'g, 9:8-12.)  Vogues seemed further confused during his hearing testimony, stating that he also saw Hoffman on the twentieth or twenty-first. (Id. at 9:16-10:12; 21:7-23.)  The Government pressed each of these witnesses on why, armed with such important information concerning their good friend, they never contacted the police.  None of them gave a substantive response. (Id. at 16:9-20:9; 25:21-28:18; 31:5-31:20.)  The Government also elicited testimony from Hutchinson and Vogues that each had a criminal history. (Id. at 15:18-16:1; 25:4-16.)

These three witnesses were the three names that Petitioner gave to Newman prior to his trial.  However, at the hearing, Petitioner also called two more witnesses[2] that, according to him, further substantiated that Newman should have investigated his alibi.  One was Janice Walden, a friend of Petitioner's, who testified that she conversed with Petitioner and Newman about the alibi defense. (Id. at 47:6-13.)  Similarly, another friend, Lisa Smalley-Burnett, testified that she separately asked Newman about the alibi defense and was told that he would not investigate without funds to do so. (Id. at 61:7-19.)

## II. DISCUSSION

---

2.   The final witness Petitioner called was his mother, Pearl McGahee.  While Petitioner's questioning seemed to focus on Newman's decision not to call her to the stand, in his post-hearing Memorandum, Petitioner does not assert that Newman was deficient for this reason.  Therefore, her testimony is not relevant to the claim actually raised by Petitioner and discussed below—whether Newman was deficient for failing to investigate Petitioner's alibi defense.  The only possible relevance of Pearl McGahee's testimony to the alibi is that she could refute the part of the Government's case that she saw Petitioner with Hoffman and Oliver prior to the robbery.  In any event, Newman makes a compelling case that she would not have been a good witness, (see Mot. Vacate Hr'g, 83:11-16), and, clearly, he was not deficient for deciding to prevent her from testifying at the trial.

## A.  Ineffective Assistance of Counsel for Failure to Investigate

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a defendant's conviction should be overturned due to the ineffectiveness of counsel.  A defendant must first demonstrate that counsel's representation was so deficient that the defendant essentially was denied the counsel guaranteed by the Sixth Amendment, and, second, that counsel's deficiency caused prejudice. Id. at 687.

### 1.  Deficiency

To prove deficiency, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 686.  In making this judgment, courts must give deference to the trial counsel's decisions, taking pains to avoid the distortion of hindsight, for "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.  It is thus incumbent on the defendant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).  The Court must examine the record, and "in light of all the circumstances, [determine whether] the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690.

It is surely among the duties of an attorney to investigate the circumstances of an alleged crime. See United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).  Thus, counsel's "decision not to investigate must be directly assessed for reasonableness." Strickland, 466 U.S. at 691.  The analysis resides on a continuum: on one end, " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' " Gray,

9

878 F.2d at 710 (quoting <u>Strickland</u>, 466 U.S. at 690-91); on the other end, "[i]neffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made," <u>id.</u> at 711; and, in the middle, " 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " <u>Id.</u> at 711 (quoting <u>Strickland</u>, 466 U.S. at 690-91).

In <u>United States v. Gray</u>, 878 F.2d 702 (3d Cir. 1988), the Third Circuit Court of Appeals concluded that the trial counsel's failure to investigate was unreasonable. The defendant, who had an extensive criminal history, had been convicted of possession of a weapon in violation of federal law. At trial, he argued that he possessed the gun in self-defense—he had been involved in a fight and grabbed the weapon from a bystander to defend himself from his assailant. Apparently, the fight had been witnessed by a crowd of people. Trial counsel asked the defendant to seek out witnesses who could attest to his story. The defendant did investigate and gave his attorney the names of at least three individuals. The attorney did not ask for further contact information; rather he asked his client to bring the witnesses to his office. When the defendant failed to do so, the attorney himself made no efforts to reach out to these witnesses. The defendant then made attempts to secure the witnesses' attendance at trial, but they did not show up. The attorney made no effort to subpoena the witnesses. <u>Id.</u> at 708-09.

The Court of Appeals observed that the attorney had completely failed to investigate.[3]  This was inexcusable, considering that the attorney had partial information on some of the witnesses, he knew there were scores of eye-witnesses, and the witnesses were vital to the defense put on at trial; in sum, his decision was not "based on tactical considerations but merely upon a lack of diligence." Id. at 711-12.  Thus, "counsel's complete abdication of the 'duty to investigate' . . . caused his performance to fall below the minimum standard of reasonable professional representation." Id. at 711.

While in Gray the court concluded that the attorney had been deficient, the Government here cites to several cases that have found no violation of Strickland's first prong when the trial counsel failed to investigate. (Gov't Mem. Opp'n 13-16.)  In McAleese v. Mazukiewicz, 1 F.3d 159 (3d Cir. 1993), the Third Circuit found reasonable both the trial attorney's decision not to put on an alibi witness and his failure to investigate corroborating phone records.  The attorney explained that he did not call the alibi witness because in doing so he risked opening up a cross-examination in which the defendant's other pending criminal matters would be exposed. Id. at 167-68.  Noting the deference owed to an attorney in his strategic choices, the court accepted the attorney's explanation for not calling the alibi witness as well within the bounds of reasonable professional judgment. Id. at 168.  As to not investigating

---

3.   The Court summarized the attorney's inaction as follows:

> [Defense counsel] admitted that he did not visit the scene of the incident or make any other effort to locate potential witnesses.  Moreover, he made no attempt to hire an investigator to search for such witnesses, although he was aware that he could have made a motion to obtain funds to hire such an investigator.  Finally, [he] acknowledged that he had made no discovery requests other than an informal call to the prosecuting attorney to obtain whatever information he had.

Gray, 878 F.2d at 709

the phone records, the attorney explained that he did not know that the technology existed for the records to be retrieved. Id. at 172.  The court stated that even if the attorney's explanation were true, it "does not end the inquiry.  The question remains—was trial counsel's lack of knowledge objectively reasonable?" Id. at 172-73.  After examining the record in depth, the court then concluded,

> Because there is no evidence in the record to support the conclusion that a competent criminal defense attorney should have known about the retrieval technology in late 1982 through mid-1983, we cannot conclude that the failure of McAleese's trial counsel to attempt to retrieve [the witness's] phone records was objectively unreasonable.

Id. at 172.  Thus, the petition failed on the first Strickland prong.

In Lewis v. Mazurkeiwicz, 915 F.2d 106 (3d Cir. 1990), the defendant's attorney did not interview a potential witness who, the defendant asserted, could have testified that he was acting in self-defense.  In examining the question of whether an attorney must investigate every lead, the court explained, "defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation." Id. at 111 (citing Strickland,  466 U.S. at 60-91).  "Thus, the issue," in a case where the attorney failed to investigate a particular witness, "is whether, under all of the circumstances, trial counsel acted reasonably in deciding not to interview [the witness]." Id. at 114.  The Third Circuit concluded that the attorney's choice not to interview the witness was reasonable because the defendant had detailed what he thought the witness would say, id. at 111; the attorney had no reason to disbelieve his client, id. at 113-14; and, after considering the facts as they applied to Pennsylvania law concerning the use of deadly force and self-defense, the attorney could have

reasonably concluded that the testimony would be damaging rather than exculpating. Id. at 112-13.

The Government also cites to cases outside of this Circuit.  In Lema v. United States, 987 F.2d 48 (1st Cir. 1993), the Court of Appeals for the First Circuit, considered an ineffective assistance of counsel claim with a somewhat similar set of facts to the one presently before the Court.  The defendant, who was accused of being the driver in a pair of drug deals, claimed that his lawyer had been deficient because he had failed to interview and put on the stand three witnesses who could testify that the defendant did not know the purpose of the trips. Id. at 54.  The Court held that "the decision to *interview* potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case." Id. at 55 (emphasis in original).  The Court noted that the attorney's strategy, based on undermining the prosecution's weak case, was viable.  Further, calling the three witnesses could have risked distracting the jury, or as the court put it, "muddying the waters." Id. at 54 (internals quotation marks omitted).  The court then stated,

> In view of the obvious tactical risks and limited benefits discussed above—
> benefits and risks which would have been readily apparent to experienced trial
> counsel without conducting an interview or further investigation—we think that
> [counsel's] failure to interview the three proposed witnesses did not amount to
> ineffective assistance in the constitutional sense. "Counsel need not chase wild
> factual geese when it appears, in light of informed professional judgment, that a
> defense is implausible or insubstantial as a matter of law, or, as here, as a matter
> of fact and of the realities of proof, procedure, and trial tactics[.]" Cepulonis v.
> Ponte, 699 F.2d 573, 575 (1st Cir. 1983).

Id.  The above statement comports with the Third Circuit's view, as expressed in Mazurkeiwicz.  It is true that a lawyer need not investigate every lead, nor is there a type of lead that a lawyer must always investigate.  The Supreme Court has avoided rigid classifications of the types of

13

information that should be investigated and the types that need not be.  Strickland demands a
review of all of the circumstances.

Based on these cases, as well as others,[4] the Court has identified several factors
central to its conclusion that, in this case, Petitioner's counsel was in fact deficient.  These
factors are not exhaustive, but they provide the blueprint for how this Court examined the
question of whether Petitioner's attorney was deficient for his failure to investigate.

The first factor is the type of evidence at issue.  For example, failing to investigate
an eye-witness raises greater concerns than failing to investigate a possible character witness;
likewise, failing to investigate the chain of custody of a weapon is, at first glance, more
questionable than failing to examine a tenuous piece of circumstantial evidence. Compare Gray,
878 F.2d 702 (granting habeas relief where the un-investigated lead was a group of eye-
witnesses), and Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992) (concluding that failing
to interview the only two eyewitnesses was deficient), with McAleese, 1 F.3d 159 (refusing to
grant habeas relief where the evidence was phone records that would have corroborated, in a
minor way, an alibi witness's testimony), and United States v. Jones, No. 99-civ-A-3976, 2001
WL 1173980, at 3 (E.D. Pa. Oct. 3, 2001) ("[T]he documentary evidence . . . does not appear to

---

4.   The other cases cited by the Government are distinguishable, though they add to the overall picture.  In Cordero
v. United States, the court found the attorney's representation to be adequate, where there was no evidence that the
client had given his attorney information concerning an alibi prior to the trial. 253 F. Supp. 2d 173, 176 (D.P.R.
2003).  Here, Newman admitted that Petitioner gave him the names of the three alibi witnesses and that he still did
not investigate.  Further, in Cordero, the court concluded there was no prejudice because the appeals court had
already concluded the alibi defense was " 'false or utterly unreliable,' " in part because at least one witness had
recanted. Id. (quoting United States v. Levy-Cordero, 156 F.3d 244, 247 (1st Cir. 1998)).
          In Sandoval v. United States, the district court did not even consider whether the attorney had been
deficient because it concluded that the petitioner had not provided admissible affidavits outlining the substance of
the alibi witnesses' testimony. No. 04-cv-4056, 2007 WL 2937124, at *3 (C.D. Ill. Sept. 26, 2007).  Here, there was
no such evidentiary issue.

have been a valuable basis for an alibi defense, and [the attorney] accordingly was not unreasonable in failing to obtain it.")

   Here, Petitioner offered Newman an alibi.  He gave Newman the names of three people who he claimed would testify that Petitioner was with them at a bar at the time of the crime.  An alibi defense is clearly among the most compelling defenses. See, e.g., Johnson v. Oklahoma, 484 U.S. 878, 881 (1987) (concluding that "by denying petitioner the chance to obtain potentially conclusive exculpatory evidence "—evidence that may have supported an alibi defense—petitioner was "deprived . . . a meaningful opportunity to present a defense").  If Petitioner's witnesses were believed, obviously no jury could convict him.  Newman's failure to investigate evidence supporting such a strong defense thus raises serious concerns.

   A second factor is the amount of knowledge the attorney has about the evidence he then chooses not to investigate.  When an attorney knows the details of what a certain witness will testify to, and then chooses not to interview that proposed witness, the decision is due greater deference than when the attorney knows nothing about the potential testimony. See Mazurkeiwicz, 915 f.2d at 111-14 (concluding that counsel's decision not to interview a witness whose potential testimony was fully set forth by the defendant was reasonable); see also Workman, 957 F.2d at 1345 (noting that an attorney could not be deficient "where the defendant gave counsel reason to believe that further investigation would be in vain").

   According to Newman's testimony at the hearing, all he could remember was that Petitioner told him there was an alibi, it involved being at a bar, and he gave Newman the names of three people who he believed would testify to his alibi.  Newman did not recall that Petitioner gave him the factual details of the alibi, or details about the witnesses themselves, and he did not

assert that these details were the reason he failed to investigate.  Lisa Smalley-Burnett,

Petitioner's friend, testified that she raised the issue of the alibi to Newman on another occasion.

She did not say that she provided detail as to who the witnesses were, their background, and what

they would say.  In other words, Newman elected not to investigate the alibi even though he

knew none of the details about the potential defense, and nothing suggested that his investigation

"would be in vain." Workman, 957 F.2d at 1345.

　　　　　　A third factor is the client's role in the decision. Where the client presses the

attorney repeatedly, further investigation is more likely to be warranted. Compare Gray 878 F.2d

702 (granting relief where on multiple occasions the client requested that his lawyer seek out eye-

witnesses and where the client investigated on his own), with Cordero v. United States, 253 F.

Supp. 2d 173, 176 (D.P.R. 2003) (denying relief where there was no evidence that the client had

ever given the attorney any information concerning an alibi defense).

　　　　　　Petitioner's brief makes the bald assertion that "Mr. McGahee informed his trial

attorney on numerous occasions that he had an alibi." (Petr.'s Mem Law Support Mot. Vacate

Sentence Pursuant 28 U.S.C. § 2255, at 9.)  This, however, is not clear from the record, in part

because Petitioner did not testify at the hearing.  Newman admits that Petitioner told him about

the alibi only one time, when Newman wrote down the names of the four witnesses.  Smalley-

Burnett testified that she separately asked Newman about the alibi defense and was told that he

would not investigate without funds to do so. (Mot. Vacate Hr'g, 61:7-19.)  The Court finds her

testimony, which was not specifically refuted by Newman, to be credible.  Therefore, it appears

that the existence of these alibi witnesses was brought to Newman's attention at least twice.

While perhaps not prodded repeatedly, Newman cannot be excused on the basis that he was never told about the alibi defense.

A fourth factor is the difficulty of performing a given investigation.  If the attorney can easily investigate, his decision not to do so raises greater concerns than if undertaking an investigation would clearly require the assembly of great resources. Compare Gray, 878 F.2d 702, 711-12 (granting habeas relief when the attorney had the names of at least three potential eye-witnesses, knew the location of the events, and could have possibly found further witnesses just by going to that location), with McAleese, 1 F.3d 159 (finding no deficiency on the part of an attorney who, according to the court, reasonably did not know that he could retrieve, nor how to retrieve, certain phone records).

Here, Newman emphasized that he could not investigate because he did not have sufficient contact information for the witnesses.[5]  As Newman explained, he needed phone numbers and birth dates, at a minimum, in order to investigate.  Assuming the lack of contact information was the reason Newman did not investigate these witnesses, "[t]he question remains—was trial counsel's lack of knowledge objectively reasonable?" McAleese, 1 F.3d at 172-73.  The Court concludes that it was not.  To investigate means to seek out unknown facts.  As Petitioner does well to point out, in this day and age, searching for a phone number is not difficult.  In McAleese, the Third Circuit concluded that an attorney's lack of knowledge was reasonable concerning the retrieval of phone records in 1982 and 1983.  In 2004 and 2005, when

---

5.   Newman also mentioned that he was not given funds to hire an investigator.  However, there is no evidence, and Newman does not even assert, that he requested funds for an investigator to search for the alibi witnesses.  And Newman was clear that the lack of funds was not the reason he did not investigate, for, as he put it, "at a minimum, [he] would have needed more information in order to locate those witnesses." (Mot. Vacate Hr'g, 78:8-14.)

Newman worked on this case, searching for a phone number or address of an individual for

whom there is a first and last name is another question altogether.  While we cannot know

whether the contact information of Vogues, Hutchinson, or Sindo was available, the reason we

do not know is that Newman did not even attempt to contact these witnesses.  Newman's excuse

is weakened considering that Petitioner also gave Newman the name of the workplace of two of

the proposed witnesses.  Surely, it does not take a trained investigator to find the phone number

for a business or a Camden County deputy sheriff.  If Newman had made even cursory attempts

to contact these witnesses, to find their phone numbers, and failed, it would be another question.

But in this case, no such effort was made.

A final factor, and perhaps the most important, is the nature and quality of the

strategy employed at trial.  For example, where the defense counsel's strategy is to attack a weak

prosecution case, and where the presentation of the un-investigated evidence could distract from

that strategy, the attorney's decision not to investigate is owed deference. See Lema v. United

States, 987 F.2d 48, 54-55 (1st Cir. 1993) (giving credence to the attorney's decision not to

investigate an alibi because of a fear that putting on an alibi defense would "muddy[] the

waters").  In contrast, where an attorney fails to investigate a lead that might provide help for the

defense actually employed at trial, the decision deserves greater scrutiny. See Gray, 878 F.2d 702

(granting relief where lawyer failed to investigate witnesses essential to proving self-defense,

which was the defense the attorney nevertheless put forward).

At the hearing, Newman attempted to justify his strategy.  He sought to create

reasonable doubt by attacking the prosecution's witnesses and calling into question the work

done by the investigating officers.  Indeed, he had some success, getting two of the four counts

18

dismissed.  Yet, his decision cannot be labeled a strategic choice between putting on an alibi

defense, on one hand, versus merely seeking to create reasonable doubt, on the other.  Newman

in fact admits that he did not make a choice at all:  "Well, I didn't have [the information for the

alibi witnesses].  So I couldn't make that choice at the time, but . . . I was satisfied that attacking

the witnesses and attacking . . . the detective [would be effective]."  (Mot. Vacate Hr'g,

81:23-82:7.)  See U.S. v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("Ineffectiveness is generally

clear in the context of complete failure to investigate because counsel can hardly be said to have

made a strategic choice against pursuing a certain line of investigation when s/he has not yet

obtained the facts on which such a decision could be made.")

Even if a particular trial strategy may be strong, a lawyer should still investigate

other leads, especially those that do not conflict with that strategy.  Various defenses need not be

mutually exclusive; to determine that one strategy might work is not to exclude all other options.

The Government makes the argument that alibis are only strong defenses when the issue is a

problematic identification.  The Court disagrees.  Any time a defendant's strategy is to show that

the prosecution cannot prove that he was the perpetrator, evidence of an alibi is compelling.

Newman argued that the Government could not prove that Petitioner drove the car and helped to

commit the robbery.  Proof of an alibi, if credible, could have assisted that defense, even

assuming Newman took a similar overall strategy at trial.

To be sure, the Supreme Court has counseled against rethinking a lawyer's

choices with the distorting benefit of hindsight, and this court carefully considered and weighed

that admonition.  Newman made several strong points as to why he was predisposed against an

alibi defense.  One critical point was that the third perpetrator, Hoffman, attempted to put on an

alibi defense in his trial, which concluded prior to Petitioner's trial beginning.  In that trial, one

of the alibi witnesses was Petitioner's own mother.  In preparing for Petitioner's trial, Newman

read the transcript, and he believed that for Hoffman the defense had been a mistake, that it "did

not go over well.  It just seemed like poor testimony, the alibi defense that Mr. Hoffman

presented." (Mot. Vacate Hr'g, 76:22-24.)  However, Hoffman clearly faced different hurdles in

his defense than did Petitioner.  Unlike Petitioner, Hoffman was the alleged mastermind in the

crime, and there was more evidence linking him to the robbery.  Moreover, of the three names of

alibi witnesses provided by Petitioner, none of them testified on behalf of Hoffman.  Thus, the

Hoffman record had very little relationship to the question of whether Newman should have

attempted to interview Vogues, Hutchinson, and Sindo.

In sum, presented with a compelling defense, Newman failed completely to

investigate.  His choice was not based on what he knew of the details of the defense, nor was

there a clear failure on the part of Petitioner to provide details to Newman as to the witnesses.

Newman had the names of three proposed alibi witnesses, and for two of them, the name of their

workplace.  The Court concludes that it was unreasonable to perform no investigation given these

circumstances.  While Newman's trial strategy may have been effective, credible proof of an alibi

would only have strengthened it.  And, in any event, Newman admits that he made no choice on

whether to investigate the alibi defense.  Therefore, Petitioner has established the first prong of

the Strickland test, that his counsel was deficient.

### 2.  Prejudice

Even after finding an attorney's performance deficient, a Court may grant habeas

relief only if the Petitioner also proves that the deficient representation caused prejudice—in

20

other words, only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  A reasonable probability is one "sufficient to undermine confidence in the outcome." Id.  Whether counsel's inadequate performance caused prejudice must be evaluated in light of the totality of the evidence at trial. Id.

        The Court first notes that the Government's case at trial was not overwhelming. There were no eyewitnesses to Petitioner's participation in the crime, other than Oliver.  As a witness, Oliver had many weaknesses that Newman did well to attack, including his delay in coming forward with the details of Petitioner's involvement, and the benefits he received in his own case by disclosing Petitioner's name.  Thus, the Court concludes that additional evidence, even of relatively minor importance, would have been more likely to tip the balance in Petitioner's favor at trial than if the Government's case had been more extensive. See Id. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); see also United States v. Agurs, 427 U.S. 97, 113 (1976) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

        The question then arises as to whether the alibi witnesses were at all credible. Vogues, Hutchinson, and Sindo's testimony raised a host of questions and problems.  They contradicted one another, as well as their own affidavits, as to the time they gathered on the evening of the crime.  Their explanation as to how they remembered the specific date in question—that they celebrated a number of January birthdays each year, none of which was alleged to be January 20—seemed questionable.  They had no explanation for why they allowed

21

their friend to sit in jail for years, without contacting his lawyer or the Government to say that Petitioner could not have committed the crime.  Two of them had criminal records, and none of them appeared on the stand to be particularly believable.  Moreover, while they were not family members, they had known Petitioner so long that it might have seemed, as a family member would, that their interest was in protecting Petitioner rather than in telling the truth. See Romero v. Tansy, 46 F.3d 1024, 1030 (10th Cir. 1995) ("[A]libi testimony by a defendant's family members is of significantly less exculpatory value than the testimony of an objective witness.").

Yet, the testimony was basically consistent.  These three individuals, one of whom was a police officer, all stated that they spent the evening in question with Petitioner at a number of bars in Camden.  There is nothing in the record conclusively showing that they were lying.  To find Petitioner guilty, a jury would almost have to believe all three men were lying.  It would essentially be their word against Oliver's—a case of credibility.  Judging credibility is the paradigmatic role of the jury.  See United States v. Scheffer, 523 U.S. 303, 313 (1998).  ("A fundamental premise of our criminal trial system is that the jury is the lie detector," whose role is "[d]etermining the weight and credibility of witness testimony." (citations and internal quotation marks omitted)).

It bears noting that the burden on Petitioner in proving the prejudice prong of the Strickland test is not to demonstrate that he would more likely than not have been acquitted but for counsel's unprofessional errors; he need merely show a reasonable probability that the outcome would have been different.  Because the evidence linking Petitioner to the crime was not overwhelming and the question of the believability of the alibi was essentially a test of credibility, the Court finds that there was a reasonable probability that the outcome would have

been different if counsel had investigated the alibi witnesses.  Therefore, the Court concludes that Petitioner's attorney's errors caused prejudice.[6]

### B. Petitioner's Other Claims of Ineffective Assistance of Counsel

Petitioner complains of two other errors made by Newman during trial:  his failure to use transcripts to impeach a photo identification; and his failure to object to impermissible vouching and misstatements of law by the Government in closing arguments.  Although the Court need not address these issues in light of the above conclusion, we nonetheless conclude that these arguments are without merit.

### 1. Failure to Use Transcripts

Petitioner argues that Newman, in his cross-examination of Oliver, should have used the transcript of Oliver's prior hearing testimony to impeach him.  At trial, Oliver testified that when Detective Callaghan interviewed him about Petitioner's role, the Detective had not given him a photograph of Petitioner prior to the identification. (Trial Tr. vol I, 167:6-168:23, July 6, 2005.)  This testimony contradicted his testimony at the Motion to Suppress Hearing, held just the day before the trial began. (See Mot. Suppress Hr., July 5, 2005, 35-38.)  At trial, Newman impeached Oliver as follows:

---

6.     The facts in Caballero v. Folino provide a good contrast to the facts here.  In Caballero, the court determined that even assuming counsel had been deficient, there was no prejudice because the alibi witnesses the attorney failed to call to the stand did not have compelling testimony and were not particularly credible. No. 04-2190, 2008 WL 650024, at *7 (E.D. Pa. Mar. 10, 2008).  Neither witness could recall whether they saw the defendant at the time of the alleged crime, instead testifying generally that they saw the defendant on the night in question. Id.  Furthermore, as family members, their testimony was not very credible, according to the court. Id.  Thus, the court concluded there was not a reasonable probability that the outcome would have been different. Id.  Here, the testimony covers the exact time of the crime.  While not perfect testimony, it was not riddled with the holes the court observed in Caballero.

Q.  Mr. Oliver, you testified yesterday that Detective Callahan showed you a single photograph about postcard size, some time prior to you seeing Mr. McGahee after he got arrested in this case, correct?

A.  I said that, yes.

Q.  You did say that under oath yesterday —

A.  Yes, I did.

Q.  — in this very courtroom sitting in that very chair you put your hand on the Bible, right?

A.  Yes, I did.

Q.  And then do you remember Mr. Troyer standing up and asking you more questions saying are you sure, is it possible you made a mistake about that, about him showing you that photograph? . . .

A.  Yes.
. . .

Q.  And you said, yeah, I'm sure, he showed me a photo—I was shown a photograph, right?

A.  Yes.
. . .

Q.  You're particularly nervous about the Government perhaps saying we think you're lying.  We're going to pull your deal.  You're real nervous about that right now, aren't you?

A.  Yes, I am.

(Trial Tr. vol I, 172:5-174:2.)  Based on this record, Newman's performance was well within the

wide range of acceptable conduct.  He thoroughly questioned Oliver on his radical shift in

testimony from the hearing to the trial just a day later, and Oliver's possible reason for making

the shift—to ensure that the Government gave him the benefit of his plea bargain.  It may have

24

enhanced Newman's cross-examination to read from the previous day's record, but the Court cannot conclude here that Newman was deficient for failing to do so.  Further, such a minor error, assuming it was one, did not cause prejudice.  If Newman had crossed Oliver with the aid of the previous day's transcript, clearly there would not have been a "reasonable probability that ... the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

### 2.  Government Vouching and Misstatements of Law

Petitioner claims that the Government improperly vouched for the credibility of its police witness by stating, among other things, that he had worked for "[s]eventeen years on the Philadelphia police force.  Seven years as a task force officer for the Drug Enforcement Administration."  The Government also stated that "Det. Callaghan wrote a lot of reports in this case.  There's stacks of them.  He wrote a lot of reports.  You don't write a report about everything in a case, otherwise you'd be at your desk constantly . . . .  I'll tell you what, you don't write reports of something that never happened." (Trial Tr. vol 3, 45-46, July 8, 2005.)  Even assuming that this was vouching—and if it was, it was a very minor example[7]—it is clear that it caused no prejudice.  Essentially, the prosecutor simply said, first, that the officer was experienced and was therefore unlikely to lie, and, second, that he worked diligently, so it would be unlikely that he had not written reports he should have written.  The Court concludes that the inclusion of these statements did not undermine confidence in the proceeding and, as such, did not prejudice Petitioner.

---

7.   "Two criteria must be met in order to find vouching:  (1) the prosecutor must assure the jury that the testimony of a government witness is credible, and (2) this assurance must be based on either the prosecutor's personal knowledge or other information not contained in the record." United States v. Saada, 212 F.3d 210, 225 (3d Cir. 2000).  While the prosecutor does seem to be educating the jury about the habits of police officers based on his own experience, it is a stretch to argue that he was "assuring" the jury of the officer's credibility.

Petitioner also asserts that the Government misstated the law by telling the jury that it had "to determine if [the detective] is lying . . . in order to acquit . . . [a]nd the only way you can acquit the defendant . . . is for you to determine that Det. Callaghan was a bald faced liar." <u>Id.</u> at 47-48.  The Court cannot agree that Newman was deficient for failing to object.  This statement was not a recitation of the law as much as it was an argument that if the jury believed the police officer, the evidence was overwhelmingly against Petitioner.  While perhaps an inartfully phrased argument on the part of the prosecution, an opposing attorney may choose not to object to minor violations in the course of a trial to maintain flow and avoid being overruled. In any event, the inclusion of this statement also clearly did not prejudice Petitioner.  For all these reasons, Petitioner's other claims of ineffective assistance of counsel are wholly without merit.

## III. CONCLUSION

For the reasons stated above, the Court grants Defendant's Motion, and orders a new trial.  An Order consistent with this Memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GARY MCGAHEE, | : | CRIMINAL ACTION |
| | : | |
| Petitioner | : | NO. 03-788 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | CIVIL ACTION |
| | : | |
| Respondent. | : | NO. 07-2398 |

---

**ORDER**

AND NOW, this 17th day of July, 2008, upon consideration of Petitioner's Motion to Vacate/Set Aside/Correct Sentence Under 28 U.S.C. § 2255 (Docket No. 63), Petitioner's Memorandum of Law in Support of Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 (Docket No. 72), and the Government's Memorandum of Law in Opposition to McGahee's Motion to Vacate Sentence Under 28 U.S.C. § 2255 (Docket No. 74), it is hereby **ORDERED** that the Motion to Vacate is **GRANTED**, and the sentence imposed on June 15, 2006, is **VACATED**, and a new trial is granted.

BY THE COURT:

*s/ Ronald L. Buckwalter*
RONALD L. BUCKWALTER, S.J.

27